UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                          :

DANA FAYE C. GO, on behalf of herself    :
and all others similarly situated,          :
                  *Plaintiff,*  :

                          :    Docket No. 23-cv-

  - against -                 :

                          :    **COMPLAINT**

RALEX SERVICES, INC., doing business as  :
GLEN ISLAND CENTER FOR NURSING   :    Trial by Jury
AND REHABILITATION, and LEAH      :
FRIEDMAN,                   :
                *Defendants.*  :
                          :
-------------------------------------------------------------x

    **PLAINTIFF** DANA FAYE C. GO ("Plaintiff" or "Go"), by undersigned counsel, on behalf of herself and all others similarly situated, as and for her complaint against Defendants Ralex Services, Inc., doing business as Glen Island Center for Nursing and Rehabilitation ("Glen Island Center"), and Leah Friedman ("Friedman"), alleges as follows:

<u>**PRELIMINARY STATEMENT**</u>

    1.    This is an action for damages and injunctive relief for violations of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1589, *et seq.*, and the New York Labor Law ("NYLL"), Article 19, §§650 *et seq*., for breach of the parties' employment contract, and for a declaratory judgment that a $25,000 "pay back" indenture is unenforceable under the TVPA, the 13th Amendment to the United States Constitution, New York statutory and common law.

    2.    The TVPA, NYLL, declaratory judgment, and breach of contract claims are brought as a class action, pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of all Filipino registered nurses who worked for or are working for

Defendant Glen Island Center since October 12, 2013 under an employment contract containing an indenture provision requiring the nurse-employee to "pay back" $25,000.

3.      This action arises out of Defendants' recruitment, provision and/or obtaining of Plaintiff's labor or services through the use of fraud and the threat of serious harm that resulted in the forced labor and wage exploitation of the Plaintiff by Defendants.

4.      Defendants are foreign labor recruiters who have recruited more than forty (40) registered nurses from the Philippines to work for Defendants in the state of New York under contracts of indentured servitude.

5.      Plaintiff was forced under the circumstances to continue working for Defendants despite her complaints of not being paid for all of her hours of work because of Defendants' threats to have her pay the $25,000 indenture.

6.      On behalf of herself and all other Filipino registered nurses employed by the Defendants, Plaintiff seeks: compensatory, punitive and emotional distress damages for violations of the TVPA; compensatory and liquidated damages and pre- and post-judgment interest for violations of the NYLL and for breach of contract; an injunction prohibiting Defendants from threatening to enforce or enforcing the indenture in the employment contracts; a declaration that the indenture is unenforceable under the TVPA, the 13th Amendment to the U.S. Constitution, 42 U.S.C. § 1994 and New York statutory and common law; an award of reasonable attorney's fees and costs as authorized by 18 U.S.C. 1595(a); and such other relief as the Court deems just and proper.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) in that the claims arise from the TVPA, 18 U.S.C. § 1589 *et seq*.

8.     This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. § 2201(a).

9.     This Court has supplemental jurisdiction over the related state law claims asserted herein under the doctrine of pendent jurisdiction and pursuant to 28 U.S.C. §1367.  Supplemental jurisdiction over those claims is appropriate because they arise from the same common nucleus of operative facts from which the federal claims arise.

10.     This Court has personal jurisdiction over Defendants, and venue is proper in this Court because Defendants' main office and headquarters and/or residence/domicile are within the Southern District of New York and because a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of New York pursuant to 28 U.S.C. §1391(b).

## PARTIES

11.     Plaintiff GO is an adult female individual who, at all times relevant, resided in Westchester County, State of New York.

12.     At all times relevant, Plaintiff GO is a registered nurse licensed in the state of New York. She is a citizen of the Philippines and a lawful permanent resident of the United States.

13.     Defendant Ralex Services, Inc. is, upon and information, a corporation duly organized and existing under the laws of the state of New York. Likewise upon information and belief, it does business as Glen Island Center for Nursing and Rehabilitation and maintains a healthcare facility located at 490 Pelham Road, New Rochelle, New York 10805, within this District.

14.     Upon information and belief, Defendant GLEN ISLAND CENTER is, at all times relevant, a healthcare services provider and is engaged in providing the services of registered nurses, among other healthcare professionals, to work at its senior living facility located within this District.

15.     Defendant FRIEDMAN is, upon information and belief, at all times relevant, the President, Chief Executive Officer, and/or the managing agent of Defendant GLEN ISLAND CENTER.

16.     Upon information and belief, Defendant FRIEDMAN resides at and is domiciled at Westchester County, New York, and/or holds offices at 490 Pelham Road, New Rochelle, NY 10805, within this District.

17.     Each Defendant was at all relevant times an "employer" within the meaning of the New York Labor Law in that each had the power to hire and fire employees; each supervised and controlled the conditions of employment, and; that each determined the rates and methods of wage payment.

18.     At all relevant times, each Defendant employed Plaintiff GO as defined by New York State Labor Law § 651(5) and (6) and applicable regulations, 12 N.Y.C.R.R. § 142-2.14.

19.     Upon information and belief, Defendants GLEN ISLAND CENTER and FRIEDMAN each had the power to hire and fire the Plaintiff, establish and pay her wages, set her work schedules and maintain her employment records.

20.     Upon information and belief, at all times relevant, Defendants GLEN ISLAND CENTER and FRIEDMAN determined Plaintiff's and other Filipino nurses' places of work-assignments, established the terms of their employment, controlled their work schedules and supervised their work.

21.     Defendant FRIEDMAN, upon information and belief, exercised complete domination and control of Defendant GLEN ISLAND CENTER in respect to the conduct alleged in this Complaint, including violations of the Trafficking Victims Protection Act designed to coerce the continued performance of Plaintiff and other Filipino nurses under their employment contracts notwithstanding the Defendants' failure to pay their services for all of their hours of work.

22.     Defendant FRIEDMAN, upon information and belief, used her complete domination and control of Defendant GLEN ISLAND CENTER to commit wrongs against Plaintiff and other Filipino nurses, including violations of the Trafficking Victims Protection Act designed to coerce the continued performance of Plaintiff and other Filipino nurses under their contracts notwithstanding the Defendants' failure to pay them for all their hours of work.

23.     Defendants GLEN ISLAND CENTER and FRIEDMAN are associated in fact and comprise a venture as that term is used in the Trafficking Victims Protection Act, 18 U.S.C. §§ 1589 and 1595.

24.     All of the acts alleged in this Complaint were authorized, ordered, and implemented by Defendants.

## STATEMENT OF FACTS

25.     Sometime November 2021, a recruiter-agent of Defendants named Jane Espino brought Plaintiff to Defendant GLEN ISLAND CENTER's New Rochelle facility to be interviewed by Defendants' Director of Nursing Eva Fabian ("Fabian").

26.     Defendants, through Fabian, offered Plaintiff immigration sponsorship to secure her permanent resident status in exchange for Plaintiff working for Defendants as a registered nurse.

27.     Plaintiff agreed to be sponsored and thereafter submitted to Defendants her educational credentials, nursing license, and immigration documents.

28.     Defendants instructed Plaintiff to coordinate with their nursing administration and their immigration lawyer to comply with sponsorship requirements.

29.     Upon information and belief, Defendants caused the filing of a Form I-140 immigrant petition on behalf of the Plaintiff with the U.S. Citizenship and Immigration Services ("USCIS") of the U.S. Department of Homeland Security on or about April 25, 2022.

30.     Upon information and belief, in filing the Form I-140 immigrant petition on Plaintiff's behalf, Defendants, as petitioning employer, promised the USCIS that they would pay Plaintiff, their beneficiary, at least the prevailing wage rate for the offered position of Registered Nurse at the area of employment.

31.     Upon information and belief, Defendants submitted to the USCIS Form ETA 9089 certification application which included this promise to pay Plaintiff at least the prevailing wage rate.

32.     Upon information and belief, Defendants made an attestation to the USCIS that "the wage the employer will pay to the alien to begin work will equal or exceed the prevailing wage that is applicable at the time the alien begins work or from the time the alien is admitted to take up the certified employment" (20 CFR Part 656 (c)(1)).

33.     Likewise upon information and belief, it was Defendant FRIEDMAN who signed the Form I-140 immigrant petition and the Form ETA 9089 certification application on behalf of Defendant GLEN ISLAND CENTER in her capacity as its Chief Executive Officer.

34.    By signing the Form I-140 petition and the Form ETA 9089, Defendants GLEN ISLAND CENTER and FRIEDMAN certified under penalty of perjury that the information contained in the immigration forms and the evidence submitted with them were true and correct.

35.    Plaintiff GO simultaneously caused the filing of her Form I-485 adjustment application and Form I-765 work employment authorization application with the Form I-140 immigrant petition.

36.    The Form I-140 immigrant petition filed by Defendants on behalf of the Plaintiff was thereafter approved by the USCIS.

37.    The USCIS approved Plaintiff's Form I-765 application and Plaintiff thereafter received her work permit card sometime in September 2022.

38.    When Defendants learned that Plaintiff's work permit card had been issued, they required Plaintiff to report to their New Rochelle facility to discuss when she would start her employment.

39.    On or about October 13, 2022, Plaintiff reported to Defendants' New Rochelle facility and met with Defendants' nursing administration.

40.    During the meeting, Defendants presented Plaintiff with an Employment Contract which they required her to sign.

41.    The Employment Contract was, upon information and belief, a standard employment contract prepared by Defendants which they required their nurse-employees to sign.

42.    The Defendants' standard employment contract for nurses, such as the one Plaintiff was required to sign, provided that the "agreement shall expire three (3) years following the date of receipt of permanent resident card".

43.    The Defendants' standard employment contract likewise provided that "if the nurse decided to leave before the end of the contract, she will have to pay back to the Employer the sum of $25,000".

44.    The Employment Contract also provided that the Nurse (that is, the Plaintiff) will be paid $36.32 per hour as a permanent full-time employee.

45.    Defendants required Plaintiff to sign the nonnegotiable Employment Contract that Plaintiff did not fully understand. Defendants presented the Employment Contract to Plaintiff on a take-it-or-leave-it basis.

46.    Plaintiff did not have any legal background or any understanding of or familiarity with American contracts law, labor law, or immigration law. Neither did she have any legal training or understanding of Philippine contracts law.

47.    Plaintiff relied on the representations by Defendants and their nursing administrators that the Employment Contract presented to her was allegedly valid and enforceable.

48.    Defendants and their nursing administrators did not inform Plaintiff that she had the right to seek the advice of counsel to review the Employment Contract presented to her.

49.    Defendants gave Plaintiff no opportunity or no extra days to accept, review, sign and return the Employment Contract.

50.    The Employment Contract that was presented to Plaintiff GO had already been pre-signed by Defendants' Administrator, Brandon Augustyniak ("Augustyniak").

51.    Defendants impressed upon Plaintiff GO that she had to sign the Employment Contract on the same day it was presented to her if she wanted her immigration sponsorship to continue and if she wanted to have employment in the United States.

52.    Like most Philippine-trained nurses, Plaintiff GO dreamt of working in the United States where employment opportunities for nurses were more stable and where wages were considerably much higher and more rewarding as compared to the Philippine situation.

53.    Like a lot of Philippine-trained nurses, Plaintiff understood and knew that working as a nurse in the United States was a way to get out of poverty and to improve her station in life.

54.    At the time Plaintiff signed the Employment Contract on October 13, 2022, she believed she would not be able to secure her green card or permanent resident status if she did not sign it, because Defendants presented the Employment Contract as a condition of her green card sponsorship.

55.    At the time Plaintiff GO did sign the Employment Contract, she believed Defendants would rescind their offer of immigrant visa sponsorship and offer of full-time employment if she did not sign it.

56.    During their October 13, 2023 meeting, Plaintiff GO and Defendants agreed that Plaintiff would start her employment with Defendants on November 1, 2022.

57.    Plaintiff GO did start her employment as a Registered Nurse of Defendants at the New Rochelle facility on November 1, 2022.

58.    Plaintiff found herself almost immediately taking care of patients/residents as soon as she started working, with barely scant orientation and training.

59.    At all times relevant, Plaintiff typically worked the 3 P.M. to 11 P.M. shift, five days a week (or 10 days per two-week pay period).

60.    Defendants assigned Plaintiff to be a charge nurse taking care on average between thirty six (36) and forty (40) rehab and long-term care patients at the facility's One West wing.

To put this into perspective, Plaintiff would have about twelve (12) minutes to take care of a patient during her shift.

61.    Defendants failed to provide adequate staff nursing assistants at the facility, which meant that Plaintiff was not only doing the work of two nurses, but was also performing duties that would typically be the responsibility of assistants, such as sanitary cleaning, hygiene care, and feeding assistance for residents unable to feed themselves.

62.    While working at the facility, Defendants required Plaintiff to report to the facility's nursing managers and supervisors who, upon information and belief, were directly employed by Defendants and/or managed or controlled by Defendants.

63.    Plaintiff did report to Defendants' nursing administrators involving the care of residents/patients and the terms and conditions of her employment.

64.    At work, Plaintiff was required to work under dangerous and unsafe conditions, sometimes caring for as many as forty (40) patients at a time. This patient load meant that Plaintiff rarely took a break and ran constantly from one patient to the next, unable to take the time she believed was necessary to provide patients with adequate care.

65.    The lack of proper orientation and job training, coupled with the unreasonable daily RN-patient ratio, made Plaintiff distressed and anxious about the safety and health of her patients and the maintenance of her nursing license. Plaintiff believed that the daily unsafe work conditions and environment jeopardized her license and the lives of her patients.

66.    On the rare occasions Plaintiff was able to take breaks, they rarely lasted longer than 10 – 15 minutes due to the severe staffing shortages and excessive number of patients in her care.

67.    At all times relevant, Plaintiff typically reported earlier than the start of her work-shift and extended her hours beyond the end of her work-shift to be able to accept or to endorse turn-over of care from the previous or to the incoming nurse on duty and to finish computer documentation.

68.    Plaintiff typically reported to work on a regular basis at least ten (10) to fifteen (15) minutes before the start of her 3 P.M. shift.

69.    Defendants' clocking-in system would not allow Plaintiff (and other employees) to clock-in more than seven minutes before the start of the shift. So even if Plaintiff had started working around 2:45 PM, she would not be allowed to clock-in.

70.    Plaintiff typically continued her work and stayed behind on a regular basis past beyond the end of her shift, from twenty (20) minutes to one (1) hour after 11 P.M.

71.    Defendants' clocking-out system would not allow Plaintiff (and other employees) from clocking-out more than seven minutes after the end of the shift. So even if Plaintiff had continued working around 11:30 PM, the time records would not be able to indicate that she worked until such time.

72.    Plaintiff's breakneck work pace was not only dangerous and exhausting for her, it also endangered her patients. Despite her best efforts, with only about 12 minutes per patient during her shift, she often could not physically get to patients fast enough to give them their medications on time, or to protect them against falls. Plaintiff commonly heard her patients moaning in agony as they waited for her or anyone else to provide them with care. Patients being fed often had to wait for some time to eat because Plaintiff did not have the capacity to assist them. Patients frantically used their call buttons and rang them repeatedly, to alert staff of their medical needs, including issues like pain, feeding, wet diapers, and falls.

73.     As a result of the dangerous and unsafe staffing practices, Plaintiff suffered from anxiety and stress and feared something wrong might happen during her work-shift that would lead to the loss of her nursing license, or worse, to the death of a patient.

74.     Starting from the time Plaintiff GO started working for Defendants on November 1, 2022, Defendants paid her an hourly wage rate of $36.32.

75.     Upon information and belief, the U.S. Department of Labor ("USDOL") prevailing wage rate for a Level 1 Registered Nurse working in Westchester County, New York for the period starting on July 1, 2023 is $38.34 per hour (*see* https://www.flcdatacenter.com).

76.     Defendants continued to effectively pay Plaintiff the hourly wage rate of only $36.32 through her last day of work.

77.     Upon information and belief, the Defendants engaged and are engaging in a policy and practice of paying their Filipino nurse-employees less than the prevailing wages that are required by federal immigration rules and regulations and by not paying them all of their hours of work in violation of their employment contracts and New York Labor Law.

78.     Plaintiff GO was effectively paid less than the prevailing wage rate determined by the USDOL starting on July 1, 2023.

79.     Defendants paid Plaintiff and other similarly-situated nurse-employees an hourly wage every two-week pay period.

80.     Upon information and belief, Defendants had power over personnel and payroll decisions regarding Plaintiff and other similarly-situated nurse-employees.

81.     Upon information and belief, Defendants had the power to hire and fire the Plaintiff and other similarly-situated nurse-employees, establish and pay their wages, set their work schedules and maintain their employment records.

82.    Plaintiff GO's and other similarly-situated employees' pay was subject to a meal period deduction even when they performed compensable work during their meal periods.

83.    Defendants' meal period deduction policy is centrally and collectively dictated, controlled and ratified.

84.    Under the meal period deduction policy, Defendants required Plaintiff and similarly-situated employees to clock out for a 30-minute meal period per work shift. In other words, there was an automatic 30-minute uncompensated time during Plaintiff's (and other employees') work shift.

85.    Plaintiff and similarly-situated employees performed compensable work for Defendants during their uncompensated meal periods.

86.    Defendants did not ensure that Plaintiff and similarly-situated employees were completely relieved of their work duties during their uncompensated meal periods.

87.    Plaintiff and similarly-situated employees were routinely not completely relieved of their job duties during their uncompensated meal periods.

88.    Defendants did not prohibit Plaintiff and similarly-situated employees from working during their meal periods and routinely suffered or permitted them to perform such work.

89.    Defendants routinely failed to ensure that unauthorized work was not being performed during employee meal periods.

90.    In fact, although Defendants deducted 30-minute meal periods, Defendants expected Plaintiff and similarly-situated employees to be available to work throughout their shifts and consistently required their employees to work during unpaid meal periods.

91.     Plaintiff and similarly-situated employees were expected to eat without any change in demands from patients/residents or relief by additional staff.

92.     Defendants often required Plaintiff and similarly-situated employees to respond to requests by patients/residents, co-workers, and supervisors, during unpaid meal periods.

93.     Defendants knew and/or had reason to believe that Plaintiff and similarly-situated employees performed work during their unpaid meal periods.

94.     Defendants discouraged employees from reporting missed meal periods because they did not want to pay employees for missed meal periods.

95.     Defendants have observed Plaintiff and similarly-situated employees working through their unpaid meal periods.

96.     Given the nursing and rehabilitation facilities' industry's demands and understaffing, Defendants knew that to get the tasks done that they assigned to Plaintiff and similarly-situated employees, Plaintiff and similarly-situated employees had to work through their unpaid meal periods.

97.     Given the nursing and rehabilitation facilities' industry's demands and understaffing, Defendants knew that to get the tasks done that they assigned to Plaintiff and similarly-situated employees, Plaintiff and similarly-situated employees had to work even before the start of their work shifts, and had to extend their hours beyond the end of their work shifts to receive or make proper endorsement of care and/or to continue with patient care and/or to finish computer documentation.

98.     Even though Defendants knew that Plaintiff and similarly-situated employees were working during "meal periods" and/or during "off-the-clock" hours, Defendants failed to

compensate Plaintiff and similarly situated employees for their work, electing instead to sit back and accept the benefits of Plaintiff and similarly-situated employees' uncompensated work.

99.     Plaintiff and, upon information and belief, other similarly-situated employees each regularly worked over forty (40) hours per week.

100.    Considering the 30 minutes every day that Plaintiff worked during meal periods, and the 30 minutes to one hour every day of "off-the-clock" work that Plaintiff rendered for Defendants, Plaintiff worked on average approximately 43 – 48 hours per workweek.

101.    Defendants did not pay Plaintiff for the 30 minutes she worked during her supposed meal periods.

102.    Defendants did not pay Plaintiff for all the time she worked during "off-the-clock" hours.

103.    Upon information and belief, Defendants typically and regularly did not pay all the hours of work of Plaintiff and of other similarly-situated employees.

104.    As a result of Plaintiff and other similarly-situated employees not being paid for all hours worked, Plaintiff and other similarly-situated employees were not paid overtime compensation for all the hours they worked over 40 each workweek.

105.    Defendants knowingly and willfully engaged in the above-mentioned violations of the NYLL.

106.    Defendants' clocking-in and clocking out systems which resulted in maintaining false and fraudulent records of employee hours and wages demonstrated their willful contempt for the laws affecting wage and hour, including the NYLL.

107.    Defendants engaged in a deliberate scheme, pattern and plan intended to cause Plaintiff and other sponsored registered nurses to believe that they would suffer serious harm if they tried to leave their employ or find other employment.

108.    Defendants' standard contract of employment provides that an immigration-sponsored registered nurse cannot stop working until s/he either pays or works off a $25,000 indenture disguised as a "repayment" or "pay back" provision.

109.    The $25,000 indenture is designed to coerce the sponsored registered nurses into continuing their employment with Defendant GLEN ISLAND CENTER.

110.    The amount of $25,000 is disproportionate to the actual costs or probable losses incurred by Defendant GLEN ISLAND CENTER.

111.    The $25,000 indenture is disproportionate to the compensation paid to the sponsored registered nurses.

112.    The purpose of the $25,000 indenture is not to compensate Defendant GLEN ISLAND CENTER for actual damages.

113.    In Plaintiff's case, she was required by Defendants to pay the immigration filing fee for her adjustment and ancillary applications, immigration lawyer's fees, immigration medical report fee, and visa screen certificate. Defendants did not have to pay for any plane fare or housing/accommodation expenses relative to her sponsorship.

114.    Defendants' actual damages caused by a breach of the employment contracts are and were readily ascertainable.

115.    Defendants did not incur $25,000 in sponsoring and hiring the services of Plaintiff GO.

116.    The purpose of the $25,000 indenture is to obtain and provide Plaintiff's continuing labor and services to Defendant GLEN ISLAND CENTER.

117.    The purpose of the $25,000 indenture is to deter Plaintiff from leaving her employment with Defendant GLEN ISLAND CENTER.

118.    Defendants were and are able to calculate the amount of actual damages they would suffer in the event an immigration-sponsored registered nurse breached the employment contract.

119.    Plaintiff reasonably feared that Defendants would sue her for the $25,000 indenture.

120.    Plaintiff reasonably feared that the costs of defending herself against Defendants' threatened legal action would cause her to suffer serious harm.

121.    The $25,000 indenture is part of a contract of adhesion that Defendants obtained as a result of unequal sophistication and bargaining power.

122.    Upon information and belief, Defendants have brought or have threatened to bring baseless lawsuits against several foreign-sponsored registered nurses to induce all foreign-sponsored registered nurses to continue working for GLEN ISLAND CENTER.

123.    Defendants' threats of baseless and abusive lawsuits against foreign-sponsored registered nurses are part of a longstanding pattern and practice designed to induce fear and prevent foreign-sponsored registered nurses from seeking other employment.

124.    Upon information and belief, Defendants did know that their pattern and practice of filing lawsuits or threatening legal actions induced fear among their foreign-trained nurse-employees and prevented them from leaving their employment and seeking employment elsewhere.

125.    Upon information and belief, Defendants' actual or threatened legal actions were pursued for the purpose of coercing other foreign-sponsored registered nurses to continue working for Defendant GLEN ISLAND CENTER.

126.    Upon information and belief, Defendants' actual or threatened legal actions were pursued with the intent to cause all foreign-sponsored registered nurses to believe that they would suffer serious psychological, financial or reputational harm if they did not continue working for Defendant GLEN ISLAND CENTER.

127.    Upon information and belief, Defendants did know that their pattern and practice of filing lawsuits or threatening legal actions caused their foreign-trained nurse-employees to believe that they would suffer serious psychological, financial or reputational harm if they did not continue working for Defendant GLEN ISLAND CENTER.

128.    Plaintiff was a recent arrival from a developing country and unfamiliar with American laws. As a result of Defendants' pattern and practice of filing lawsuits or threatening legal actions, and given the particular vulnerabilities of Plaintiff, Plaintiff reasonably believed that she would suffer serious psychological, financial or reputational harm if she did not continue working for Defendant GLEN ISLAND CENTER.

129.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other foreign-sponsored registered nurses continued working for the Defendants at hours that were not fully and not properly compensated.

130.    Plaintiff GO had wanted to leave Defendants' employ much earlier, especially after it became clear to her that the facility's RN-patient ratio would not change for the better. However, she was unable to leave because of the severe financial penalty she would have to pay

under her contract's "pay back" or "repayment" provision and also because of the fear caused by the threat of a lawsuit to enforce said "pay back" provision.

131.    Plaintiff's inability to leave Defendants caused her substantial distress. Many nights when she returned from work, Plaintiff cried. She felt desperate, helpless and depressed. She felt trapped and scared.

132.    Plaintiff was terrified to resign from her job but felt that her working conditions were extremely unsafe, dangerous and presented a genuine risk to her nursing license. If Plaintiff lost her license, she would end up even more helpless. Eventually, notwithstanding the substantial risks, she decided to resign from her job and hoped to save her mental health and her license.

133.    Sometime in September 2023, Plaintiff initially wanted to negotiate the "pay back" provision of her Employment Contract with Defendants.

134.    On two separate occasions in September and in October 2023 when Plaintiff was discussing possible amicable negotiations with Defendants, she was told by Defendants' Administrator Augustyniak that if she left Defendants' employment without paying the $25,000 "pay back" penalty, Defendants would have to involve lawyers and that their lawyer would be eager to act to stop or block Plaintiff's prospective application for naturalization.

135.    Plaintiff GO became even more distressed about Defendants' overt threats to her immigration status.

136.    Plaintiff eventually decided to seek legal advice and thereafter decided to have the courts declare the "pay back" provision of her Employment Contract unenforceable.

137.    Plaintiff GO resigned from her employment effective on October 9, 2023.

138.    Plaintiff continues to suffer stress, anxiety, guilt and depression as a result of her forced labor experience with Defendants and her consequent decision to resign from her job. She continues to face ongoing harm because of Defendants' ongoing threat to enforce the illegal "pay back" or "repayment" provision to which Defendants claim Plaintiff is bound.

139.    Much, if not all, of Plaintiff's "pay back" or "repayment" penalty was not meant to cover costs specifically associated with Plaintiff. To the contrary, it was merely additional income to Defendants, used by GLEN ISLAND CENTER to cover their ordinary business expenses.

140.    Had Plaintiff actually made the "repayment" penalty of even $15,000, Defendants would have paid Plaintiff negative wages in her final workweek.

141.    Even if some of the "repayment" penalty was, in theory, meant to reimburse Defendants for costs incurred for Plaintiff's benefit, Plaintiff was still going to be paid below the minimum wage. This is because most of the "pay back" or "repayment" penalty was designed to, or did in fact, cover Defendants' expenses incurred for Defendants' benefit. For example, expenses related to immigration including certain filing fees, recruitment/agency fees, and legal costs, are clearly Defendants' normal business operating expenses.

## CLASS ACTION ALLEGATIONS

142.    Plaintiff GO brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

143.    Plaintiff asserts claims on behalf of and seeks to represent the following Class:

> All hourly-paid Filipino registered nurses sponsored and employed by Glen Island Center since October 12, 2013 who were required to sign contracts with a "pay back" provision.

144.    Plaintiff reserves the right to amend and refine the class definition above or add classes and/or subclasses as litigation progresses.

145.    The claims of the Class are properly brought as a class pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because the Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

146.    The claims of the Class are properly brought as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure for the following reasons:

(a) Numerosity: The potential class members are so numerous that joinder of all members is impracticable. Although the precise number of such persons is unknown, and the facts on which the calculation of the number are presently within the sole control of the Defendants, upon information and belief, there are approximately more than forty (40) members of the Class during the relevant class action period, most of whom would not be likely to file individual suits because they lack adequate financial resources, access to attorneys, and/or knowledge of their claims, and are fearful of retaliation.

(b) Commonality: There are questions of law and fact common to Plaintiff and the members of the Class that predominate over any questions affecting only individual members. These common questions of law and fact include:

(i)    Whether Defendants obtained the labor of Filipino registered nurses by using serious harm or threats of serious harm in violation of the TVPA;

(ii)    Whether Defendants' uniform practices surrounding the "pay back" provision and conditions of work constitute attempted labor trafficking in violation of the TVPA;

(iii)    Whether Defendants knowingly recruited Filipino registered nurses and knowingly benefited by their violations of the TVPA;

(iv)    Whether the indenture or so-called "pay back" provision in Defendants' employment contracts is enforceable;

(v)    The proper measure of damages; and

(vi)    The proper measure of punitive damages.

These common questions arise, in part, because of the uniform circumstances under which Plaintiff and the Class worked. These include the form contracts and workplace policies that resulted in a standard set of employer-mandated conditions that employees were forced to abide by under the same threat of being sued, suffering adverse immigration consequences, and facing financial harm.

(c) Typicality: The claims of Plaintiff are typical of the claims of the Class she seeks to represent. Plaintiff and Class members are Filipino immigrant nurses. They work or have worked for Defendants as hourly-paid nurses. They enjoy the same rights to be paid wages for all hours worked at the prevailing wage rates mandated by federal immigration rules. Plaintiff and Class members have all sustained similar types of damages as a result of Defendants' failure to comply with the employment contracts resulting in their hours of work not all getting compensated and of Defendants' use of threats of legal action to enforce the "pay back" provision in their employment contracts. Plaintiff and the members of the Class have all been

injured in that they have been under-compensated due to Defendants' policy, practice and pattern of conduct of not paying them for all of their hours of work.

(d) Adequacy of Representation: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff understands that as a class representative, she assumes a fiduciary responsibility to the Class to represent its interests fairly and adequately. Plaintiff recognizes that as a class representative, she must represent and consider the interests of each Class member just as she would represent and consider her own interests. Plaintiff understands that in decisions regarding the conduct of the litigation and its possible settlement, she must not favor her own interests over the interests of the Class. Plaintiff recognizes that any resolution of the class action must be in the best interests of the Class. Plaintiff understands that in order to provide adequate representation, she must be informed of developments in litigation, cooperate with class counsel, and testify at deposition and/or trial. Plaintiff has retained counsel competent and experienced in complex class actions, employment litigation and TVPA claims. There is no conflict between Plaintiff and the members of the Class.

(e) Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy – particularly in the context of wage and hour litigation and labor trafficking litigation, where individual plaintiffs lack the financial resources to vigorously prosecute a lawsuit in federal court against corporate defendants. In addition, class litigation is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about Defendants' practices.

147.    Common questions of law and fact also predominate as to Plaintiff's claim that Defendants attempted to obtain forced labor in violation of law. Defendants attempted to keep every Filipino registered nurse they sponsored in their employ through the threats of severe

penalties and litigation, as well as through threats of serious harm affecting the nurse's immigration and employment status. That attempt – regardless of whether an employee could eventually pay the severe monetary penalty or the degree to which they were forced to continue working against their will – was the same and uniformly made as to each and every sponsored employee.

148.    Plaintiff intends to send notice to all members of the Class to the extent required by Fed. R. Civ. P. 23(c)(2). The names and addresses of the Class members are available from Defendants' records.

**FIRST CAUSE OF ACTION**
**Violations of the Trafficking Victims Protection Act, 18 U.S.C. § 1589(a)**
**(Brought on behalf of Plaintiff and the Class)**

149.    Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 148, as if set forth fully herein.

150.    It is a violation of the TVPA to "knowingly provide[] or obtain[] the labor or services of a person . . . (2) by means of serious harm or threats of serious harm . . . ; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm . . ." 18 U.S.C. § 1589(a).

151.    The TVPA defines "serious harm" to include nonphysical harm, "including psychological, financial, or reputational harm, that is sufficiently serious . . . to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services to avoid incurring that harm." *Id.* § 1589(c)(2).

152.    Defendants knowingly provided and obtained the labor and services of Plaintiff and other members of the Class by means of the abuse or threatened abuse of law or legal process to exert pressure on Plaintiff and other members of the Class to continue working for the Defendants and to refrain from seeking employment elsewhere.

153.    Defendants knowingly provided and obtained the labor and services of Plaintiff and other members of the Class by means of serious harm and threats of serious harm to Plaintiff and other members of the Class, including without limitation, psychological, financial or reputational harm that was sufficiently serious to compel a reasonable person of the same background and in the same circumstance to perform or to continue performing labor or services in order to avoid incurring that harm.

154.    Defendants knowingly provided and obtained the labor and services of Plaintiff and other members of the Class by means of a scheme, plan, or pattern intended to cause Plaintiff and other members of the Class to believe that, if they did not perform such labor or services, they would suffer serious harm, including without limitation, psychological, financial or reputational harm, that was sufficiently serious to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

155.    Defendants obtained the labor of Plaintiff and the Class members through the terms and administration of their contracts of employment with employees that had a "pay back" provision.

156.    Defendants kept Plaintiff and the Class members working for them against their will with the contract's terms of indentured servitude, with an unenforceable monetary penalty masquerading as a "pay back" provision, with threats of litigation, and with contractual

provisions that caused employees to fear withdrawal of immigration sponsorship or withholding of employment.

157.    The "pay back" or "repayment" provision is intended to achieve purposes that are illegal under the TVPA, as it aims to procure or maintain the labor or services of Plaintiff and the Class by threatening them that they will have to repay $25,000 if they leave their job before the end of three years after the receipt of their permanent resident card.

158.    Defendants' contracts of employment further provide that if the nurse reneges on her commitment to work for at least three years following the date of receipt of permanent resident card, she will be held liable for, among other things, "attorney's fees and all related expenses incurred by the Employer".

159.    These threats constitute the "threatened abuse of legal process" and/or a threat of "serious harm", in violation of 18 U.S.C. § 1589(a)(2)-(3).

160.    Defendants knowingly used such threats to exert pressure on Plaintiff and the Class members to continue working for Defendants and to prevent them from seeking employment elsewhere, telling them that they would be on the hook for $25,000, unless they worked for at least three years following the date of receipt of the permanent resident card. This was done with the purpose of obtaining Plaintiff's and the Class's continued labor for Defendant GLEN ISLAND CENTER.

161.    Defendants' use of such means to obtain the labor of Plaintiff and the Class was knowing and intentional.

162.    Plaintiff and the Class suffered damages as a direct and proximate result of Defendants' conduct. These damages include, but are not limited to, emotional distress damages

and the loss of proper and correct wage payments, including the prevailing wage rates and compensation for all hours worked.

163.    Plaintiff and, upon information and belief, the members of the Class each suffered and continue to suffer emotional distress and financial distress due to Defendants' coercive and/or fraudulent tactics resulting in their forced labor and/or trafficking.

164.    The emotional effects Plaintiff and, upon information and belief, the Class members suffered and continue to suffer include disrupted sleeping, emotional breakdowns, nightmares, ongoing feelings of fear, difficulty developing trust, anxiety, depression, difficulty concentrating and stress.

165.    Plaintiff and the Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorney's fees and the costs of this action.

<u>**SECOND CAUSE OF ACTION**</u>
**Violations of the Trafficking Victims Protection Act, 18 U.S.C. § 1589(b)**
**(Brought on behalf of Plaintiff and the Class)**

166.    Plaintiff realleges and incorporates by reference all allegations incorporated in and set forth in paragraphs 149 through 165 as if set forth fully herein.

167.    It is a violation of the TVPA to "knowingly benefit" from participation in a venture which obtains labor in violation of the TVPA, while "knowing or in reckless disregard of the fact" that the venture has obtained labor through such means. 18 U.S.C. § 1589(b).

168.    Defendants knowingly benefited from their participation in the forced labor venture described herein by earning substantial profits from the venture. Defendants engaged in the providing or obtaining of labor or services by the means described above.

169.    Each Defendant knew or recklessly disregarded the fact that the venture described herein engaged in obtaining forced labor.

170.    Plaintiff and the Class suffered damages as a direct and proximate result of Defendants' conduct. These damages include, but are not limited to, emotional distress damages.

171.    Plaintiff and the Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorney's fees and the costs of this action.

### THIRD CAUSE OF ACTION
**Violations of the Trafficking Victims Protection Act, 18 U.S.C. § 1590(a)**
**(Brought on behalf of Plaintiff and the Class)**

172.    Plaintiff realleges and incorporates by reference all allegations incorporated in and set forth in paragraphs 149 through 171 as if set forth fully herein.

173.    It is a violation of the TVPA to "knowingly recruit[], . . . transport[], provide[] or obtain[] by any means, any person for labor or services in violation of" the TVPA.

174.    Each Defendant knowingly and purposefully recruited Plaintiff and the Class members, as described herein, in violation of the TVPA.

175.    Each Defendant knowingly and purposefully provided the labor of Plaintiff and the Class members, as described herein, in violation of the TVPA.

176.    Each Defendant knowingly and purposefully obtained the labor of Plaintiff and the Class members, as described herein, in violation of the TVPA.

177.    Plaintiff and the Class suffered damages as a direct and proximate result of Defendants' conduct. These damages include, but are not limited to, emotional distress damages.

178.    Plaintiff and the Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorney's fees and the costs of this action.

## FOURTH CAUSE OF ACTION
### Violations of the Trafficking Victims Protection Act, 18 U.S.C. § 1594(a)
### (Brought on behalf of Plaintiff and the Class)

179.    Plaintiff realleges and incorporates by reference all allegations incorporated in and set forth in paragraphs 149 through 178 as if set forth fully herein.

180.    Attempts to violate the TVPA are themselves violations of the TVPA. 18 U.S.C. § 1594(a).

181.    Each Defendant attempted to violate 18 U.S.C. §§ 1589 and 1590, as described herein.

182.    Plaintiff and the Class suffered damages as a direct and proximate result of Defendants' conduct. These damages include, but are not limited to, emotional distress damages.

183.    Plaintiff and the Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorney's fees and the costs of this action.

## FIFTH CAUSE OF ACTION
### New York Labor Law (NYLL)
### (Brought on behalf of Plaintiff and the Class)

184.    Plaintiff realleges and incorporates by reference all allegations incorporated in and set forth in paragraphs 1 through 106 and in paragraphs 142 through 148 as if set forth fully herein.

185.    At all relevant times, Plaintiff and the members of the Class, have been employees of the Defendants, and the Defendants have been their employer within the meaning of the New York Labor Law, §§2 and 651.

186.    Defendants failed and have failed to pay the Plaintiff and the members of the Class compensation for all their hours of work, in violation of NYLL Article 19, §§650 *et seq.* and the supporting New York State Department of Labor regulations, including at least minimum wages for the hours that were not paid, and also premium overtime pay for all hours of work in excess of forty (40) hours per work-week.

187.    Defendants violated Plaintiff's rights and the rights of the members of the Class, by failing to pay them for all of the hours actually worked by them.  Defendants' violations of the NYLL have been willful and intentional.

188.    Defendants' violations of the NYLL have caused Plaintiff and the members of the Class irreparable harm and injury.

189.    Due to Defendants' NYLL violations, Plaintiff and the members of the Class are entitled to recover from Defendants their unpaid wages, liquidated damages, as well as reasonable attorney's fees, and costs and disbursement of the action.

## SIXTH CAUSE OF ACTION
### Breach of Contract
### (Brought on behalf of Plaintiff and the Class)

190.    Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 106 and in paragraphs 142 through 148 as if set forth fully herein.

191.    Plaintiff GO entered into a contract of employment with Defendant GLEN ISLAND CENTER regarding her employment on or about October 13, 2022. A copy of the contract is attached as Exhibit "1".

192.    Upon information and belief, each member of the Class likewise entered into an identical contract of employment with Defendant GLEN ISLAND CENTER which contained basically similar or identical terms as those in the contract signed by Plaintiff.

193.    The contracts provided that Defendant GLEN ISLAND CENTER would pay Plaintiff and each member of the Class an hourly pay for each hour of service rendered as a Registered Nurse.

194.    Plaintiff and each member of the Class substantially performed under the contracts of employment.

195.    Defendant GLEN ISLAND CENTER breached the contracts of employment by failing to pay Plaintiff and each member of the Class for all of their hours of work.

196.    Plaintiff and each member of the Class suffered damages as a direct and proximate result of Defendant GLEN ISLAND CENTER's breach of the contracts of employment.

197.    Plaintiff and each member of the Class are entitled to compensatory damages for breach of contract in an amount to be determined at trial.

**SEVENTH CAUSE OF ACTION**
**Declaratory Relief Under 28 U.S.C. § 2201**
**(The Pay Back or Repayment Provision is Invalid under the 13th Amendment**
**and under the Trafficking Victims Protection Act, 18 U.S.C.§ 1589)**
**(Brought on behalf of Plaintiff and the Class)**

198.    Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 183 as if set forth fully herein.

199.    The 13th Amendment to the United States Constitution provides that involuntary servitude shall not exist within the United States or any place subject to their jurisdiction.

200.    The so-called "pay back" or "repayment" provision in Defendants' employment contracts is intended to keep Plaintiff and members of the Class in a position of involuntary servitude.

201.    The so-called "pay back" or "repayment" provision in Defendants' employment contracts has the effect of keeping Plaintiff and members of the Class in a position of involuntary servitude.

202.    A Court may not use its legal authority and power to enforce so-called "pay back" or "repayment" provision in an employment contract that has the purpose and effect of keeping Plaintiff and members of the Class in a position of involuntary servitude.

203.    The "pay back" or "repayment" provision is intended to achieve purposes that are illegal under the TVPA, as it aims to procure or maintain the labor or services of Plaintiff and the Class members by threatening them that they will have to repay $25,000 if they leave their job.

204.    These threats constitute the "threatened abuse of legal process" and/or a threat of "serious harm", in violation of 18 U.S.C. § 1589(a)(2)-(3).

205.    Defendants knowingly used such threats to exert pressure on Plaintiff and the Class members to continue working for GLEN ISLAND CENTER and to prevent them from seeking employment elsewhere, telling them that they would be on the hook for $25,000, unless they worked for at least three years following the date they received their permanent resident cards. This was done with the purpose of obtaining Plaintiff's and the Class members' continued labor for Defendant GLEN ISLAND CENTER.

206.    Additionally, the "pay back" or "repayment" provision's requirement that Plaintiff and the Class members pay GLEN ISLAND CENTER "attorney's fees" if GLEN ISLAND CENTER prevails is inconsistent with the one-way fee shifting provision in the TVPA, which allows the victims of trafficking to recover their attorney's fees in civil actions brought under the TVPA.

207.    Plaintiff and the Class members have a definite and concrete dispute with Defendants concerning the enforceability of the "pay back" or "repayment" provision.

208.    The dispute touches the legal relations of parties having adverse legal interests.

209.    The dispute is real and substantial.

210.    The dispute admits of specific relief through a decree of a conclusive character.

211.    The dispute involves a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

212.    By reason of the foregoing, an actual and justiciable controversy exists between Plaintiff and the members of the Class, on one hand, and Defendants, on the other hand.

213.    Accordingly, Plaintiff, on behalf of herself and the Class, seeks a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201, that the "pay back" or "repayment" provision in Defendants' employment contracts is void and unenforceable under either or both the 13th Amendment to the U.S. Constitution and the TVPA.

### EIGHTH CAUSE OF ACTION
**Declaratory Relief Under 28 U.S.C. § 2201**
**(The Repayment Provision is Invalid Under the Fair Labor Standards Act,**
**29 U.S.C. § 201 *et seq*. Because It Would Reduce Plaintiff's Wages**
**Below the Federal Minimum Wage)**
**(Brought on behalf of Plaintiff and the Class)**

214.    Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 198 through 213 as if set forth fully herein.

215.    When Plaintiff and the Class members worked for Defendants, each of them was an employee pursuant to the Fair Labor Standards Act ("FLSA").

216.    Each Defendant was Plaintiff's and each Class member's employer under the FLSA.

217.    The "pay back" or "repayment" provision is intended to achieve purposes that are illegal under the FLSA, as it aims to force Plaintiff and the Class members to pay Defendants business expenses --- costs that are principally for Defendants' own benefit --- and thus reduce Plaintiff's and Class members' wages in their last workweek below the federal minimum wage.

218.    The "pay back" or "repayment" provision is thus illegal and unenforceable, under the FLSA because it would, if enforced, permit Defendants to pay Plaintiff and the Class members, its workers, wages that are below the federal minimum wage.

219.    In satisfying their federal minimum wage obligations, Defendants may not seek to recover costs or damages that are primarily for their own benefit. In this case, such costs or expenses include, among other purported damages, Defendants' immigration sponsorship expenses, filing fees, recruitment fees or costs, plus legal costs that would mean attorney's fees and the costs of this suit.

220.    Defendants' attempt to recoup costs and expenses that are for the benefit of Defendants violates the FLSA because in so doing, Defendants would not pay Plaintiff and the Class members wages "free and clear".

221.    Because the recovery of damages such as immigration expenses and immigration filing fees, recruitment fees or costs, or attorney's fees and costs of this suit would reduce Plaintiff's and Class members' wages in the last week of their employment below the federal

minimum wage, the enforcement of the "pay back" or "repayment" provision would violate the FLSA.

222.    Additionally, the "pay back" or "repayment" provision's requirement that Plaintiff and the Class members pay Defendants' legal costs, including attorney's fees and costs of this suit, if Defendants prevail in this case, is inconsistent with the one-way fee shifting provision in the FLSA, which allows prevailing employees, but not employers, to recover their reasonable attorney's fees in actions brought under the FLSA.

223.    Accordingly, Plaintiff, on behalf of herself and the Class, seeks a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201, that the "pay back" or "repayment" provision is unenforceable.

## NINTH CAUSE OF ACTION
### Declaratory Relief Under 28 U.S.C. § 2201
**(The Liquidated Damages Provision is Unconscionable and Unenforceable Under New York Statutory and Common Law)**
**(Brought on behalf of Plaintiff and the Class)**

224.    Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 198 through 223 as if set forth fully herein.

225.    The parties' employment contract that included the $25,000 "pay back" penalty provision was drafted by Defendants alone; it was never negotiated by the parties; and under the circumstances, was basically forced upon Plaintiff to sign and execute.

226.    The "pay back" provision is unconscionable as a matter of New York law.

227.    Plaintiff was forced to sign the employment contract containing the $25,000 "pay back" penalty provision on a take-it-or-leave-it basis and faced substantial harm if she did not sign the agreement, including potentially having her offer of immigration sponsorship withdrawn or having her employment offer rescinded, and any of such would be financially ruinous to her.

Plaintiff lacked meaningful choice about whether to enter into and sign the employment agreement.

228.    Further, Defendant GLEN ISLAND CENTER is a temporary health care services agency under New York Public Health Law § 2999-JJ.

229.    Defendant GLEN ISLAND CENTER's "pay back" penalty provision violates New York Public Health Law § 2999-JJ (3)(d) which mandates that a temporary health care services agency "shall not require the payment of liquidated damages, employment fees, or other compensation should the health care personnel be hired as a permanent employee of a health care entity in any contract with any health care personnel or health care entity or otherwise".

230.    The "pay back" provisions of Defendants' employment contracts are actually a penalty.  While the provision fixed the damages in the event of a breach, the amount liquidated, which is $25,000.00, did not bear a reasonable proportion to the probable loss.  $25,000 is grossly disproportionate to the amount of probable loss by the Defendants.

231.    Accordingly, Plaintiff seeks a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201 that the "pay back" penalty provision is illegal and unenforceable.

## TENTH CAUSE OF ACTION
### Unjust Enrichment / *Quantum Meruit*

232.    Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 141 as if set forth fully herein.

233.    Plaintiff brings this cause of action in the alternative to her claim for Defendants' failure to pay her the prevailing wage rate starting on July 1, 2023 as determined by the U.S. Department of Labor, and to her claim for Defendants' failure to pay her the proper compensation for all of her hours of work.

234.    Plaintiff was not paid the 2023 prevailing wages for all of the time she worked for Defendants.

235.    Plaintiff was not paid her proper wages for all her hours of work.

236.    Plaintiff conferred a benefit upon Defendants by performing work for which she was not fully compensated.

237.    Defendants knew and appreciated that they were receiving the benefit of the uncompensated work performed by the Plaintiff.

238.    Defendants retained the benefit of the uncompensated work performed by the Plaintiff under circumstances which render it inequitable and unjust for Defendants to retain such benefits without paying for their value.

239.    Defendants were unjustly enriched by requiring the Plaintiff to work without paying the prevailing wage rate for all hours worked and for not paying her the proper compensation for all her hours of work.

240.    Plaintiff rendered valuable services to Defendants.

241.    The services were accepted, used, and enjoyed by Defendants.

242.    The services were rendered under such circumstances that reasonably notified Defendants that the Plaintiff, in performing such services, expected to be paid the prevailing wage rate by Defendants and the proper compensation for all her hours of work.

243.    Accordingly, Defendants have been unjustly enriched, and Plaintiff seeks to be entitled to the value, *quantum meruit*, of the services rendered by her to Defendants.

## **DEMAND FOR JURY TRIAL**

244.    Plaintiff is entitled to and hereby demands a jury trial in this matter on all issues of fact raised by the Complaint.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Dana Faye C. Go requests judgment against each Defendant, jointly and severally, awarding her and all others similarly situated: compensatory and punitive damages for violations of the TVPA; compensatory damages for violations of the NYLL, breach of contract and unjust enrichment; pre- and post-judgment interest at the statutory rate of 9% on all damages awarded for violations of New York laws; an injunction prohibiting the Defendants from threatening to enforce or enforcing the "pay back" penalty provision in the employment contracts; a declaration that the "pay back" or "repayment" provision in Defendants' employment contracts is unenforceable under the 13th Amendment, the TVPA, the FLSA, New York statutory and/or common law; an award of reasonable attorney's fees and costs as authorized by 18 U.S.C. § 1595(a); and such other relief as the Court deems just and proper.

Dated: October 11, 2023.

Respectfully submitted,

LAW OFFICE OF FELIX VINLUAN

*/s Felix Q. Vinluan*
By:    **FELIX Q. VINLUAN**
6910 Roosevelt Avenue, 2nd Floor
Woodside, NY 11377
Tel. No. 718-478-4488
Email: fqvinluan@yahoo.com

JUDE TADEO PALCES LAW

*/s Jude T. Palces*
By:    **JUDE T. PALCES**
535 Lakeville Road
New Hyde Park, NY 11040
Tel. No. 917-816-0482
Email: jtpalces@gmail.com
*Attorneys for Plaintiff and the Putative Class*

## VERIFICATION

STATE OF NEW YORK    )
COUNTY OF QUEENS    ) S.S.

    I, **DANA FAYE C. GO**, of legal age and a resident of the state of New York, after having been sworn in accordance with law, hereby state that I am the plaintiff  in the within Complaint. I have read the foregoing complaint and know the contents thereof.   The contents are true to my knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.

**DANA FAYE C. GO**

    SUBSCRIBED AND SWORN to before me on October 11, 2023.

**Notary Public**

FELIX Q. VINLUAN
Notary Public, State of New York
No. 02VI6129101
Qualified in Nassau County 25
Commission Expires June 20, 20

39